The last case for argument this morning is 21-1524 Wright v. HHS. Ms. Patton, whenever you're ready. Thank you. The issue before the court today is whether diagnostic tests performed more than six months after vaccine administration can satisfy the Vaccine Act severity requirement even if those tests confirm that the injured person no longer suffers from the alleged injury. Specifically, we're looking at Section 11C1D of the Vaccine Act, which states that a petition shall contain supporting documentation demonstrating that the person who suffered such vaccine-related injury suffered the residual effects or complications of such illness, injury, or condition for more than six months after administration of the vaccine. Can I just interrupt? You said 30 seconds ago, which even if the tests confirm that they do not have the ITP. Correct. That suggests perhaps that your position would be different if this individual were tested for ITP, as he was, and the tests showed that he had a low platelet count. Correct. If those tests showed that he was still suffering from ITP, he would still be suffering from that injury or condition. Would you accept that if he had a low platelet count, say at the 12-month mark, that that low platelet count would in fact be connected to the low platelet count that he had right after the vaccine, or might it be an unconnected thing? Is your question, just so I can understand and answer it properly, that there are no intervening tests and you're looking at a test 12 months in the future? I guess I just want to understand what you're, you said to Judge Prost that your position would be different. Would your position be that yes, that would mean that he would qualify from a low platelet count more than six months after, full stop, without further inquiry? Or would there be a further inquiry about whether that low platelet count is actually a residue of the earlier one? I understand. If there had, as in this case, been a full resolution of the injury, and then later there's a test that had low platelets, we would need to take a look at the record to see the circumstances surrounding that. In the qualifications and aids to interpretation, for example, it specifically states that thrombocytopenia caused by an infection, including rhinovirus, the common cold, is specifically not something that could be compensated. So it's not something easy to address in a vacuum. Let's talk about this case then. Sure. I mean, this case at some level was resolved, but it's a little confusing to me based on the record because it was resolved, but there is still a recommendation that there continue to be periodic testing. And you just said, not resolved, but fully resolved. In this case, if he had tested positive, not positive, I'm sorry, you understand. If he had had the low platelet count, would the government have considered that a continuation of the initial condition and compensable? You understand what I'm saying? Sure. So if the test that had been performed after six months, if he was continuing to be monitored by his hematologist and his platelet counts continued to be- No, no, no. I'm talking about this case. And you know the facts, I hope, better than I do. Yes. Which is his platelet count went up to normal, so there was some suggestion that this was resolved. But there was also a medical assertion, and consistent with the medical standard of care, that if he demonstrated some symptoms, at least within the period we're talking about, which is like two years, then it could be related to ITP, and therefore he needs to be tested for ITP. That's our case.  Correct. So in this circumstance, I thought you started, and I wanted to probe, because you said even in this circumstance where it didn't confirm he had ITP, if he had the same test and the test showed low platelets, is it the government's position that that would be compensable? If there were no other- So in this case where there was- prior to at least his April 2016 test results, platelet counts that were normal, but if he continued to have, which he doesn't in this case, if he had continued to have low platelet counts, then his ITP would not have been resolved. Can I just clarify, or ask you to clarify for me what you're saying here? Are you saying if he had a continuing low platelet count that was attributable to ITP, that would be compensable? But it's not just the low platelet test result of a low platelet count that would make it compensable. It has to be an effect of the condition caused by it. So there can be any number of reasons why you have a low platelet count and why you would monitor it after you've had a condition like this, but it's only a low platelet count that somebody can add to this condition that would be compensable, not just a test and, oh yes, low platelet count. That's absolutely correct. It has to be a residual effect or a complication of that initial diagnosis of ITP. And what do we do with that? I mean, I thought that's why, I mean, at least it was the medical decision that because of his precondition of ITP, that's why he should have this test. Presumably that means that there's some greater likelihood or risk or relationship between the prior incidence of ITP and the passage of a year or two or whatever. So when he demonstrates bruising, it's not because if he had never had ITP, he would have come in and they would have said, you need an ITP shot. It's given his history. Presumably my understanding, non-medical understanding, is because it's given the context, it makes it more likely. I don't know. I mean, I asked if the government has a position on that because you suggested that there's a distinction here because he didn't have ITP, but if he had, the result would have been different. And I'm trying to see what that result, what that different result looks like. We have many of these cases in the program. A case like this is not compensable. Those that are compensable, the children would continue to be on medication. There was no medication at all in this case ever needed. They would continue to go in and they're not considered. Continue when? Beforehand? Like this particular individual, you're saying it would not be compensable because he hadn't continued to be on medication full stop? No. It's not compensable because he had fully recovered from his ITP within three months. He may have even fully recovered under a table definition which strictly defines ITP as a. Okay. So, well, first, I'm not sure in the record it says fully recovered. One person said recovered. But explain to me then what you understand from the medical stuff. There is indication that they said, yes, you've recovered from your first bout with ITP. But they continue to say if you exhibit bruising, I mean this was a medically required thing. This wasn't discretionary. Let me finish. So if the same doctors or different doctors that said you've recovered say, but if you exhibit symptoms like bruising, it's medically necessary or medically desirable that we test you for ITP, suggesting that that indicates that you haven't really recovered. And so if we're talking about recovery as opposed to getting something new and different, either because you had a preexisting disposition, which nobody ever mentions here, nobody mentions that there would be another reason or that it wouldn't be related even though they said he's recovered. So can you explain that to me? Sure. I believe, and I hope I'm addressing your question correctly, is it is standard medical care based on his history that he had that testing when he showed up with bruising, even though in the medical records it indicates he had typical childhood bruising. This is a young child. They show up with bruises on their shins, on their arms all of the time. And in the records it specifically notes multiple times typical childhood bruising. In the majority of the cases where they did the platelet counts, the mother requested that they do the platelet counts to check. Well, we have testimony that says that it was medically standard procedure to do the testing given the bruises. So you might say it's the mother, but except my premise that I'm saying that it was medically necessary, because that's what I think all the experts say. I do think that the crux of the matter here is that in order to find that in this case the child BW met the six-month severity requirement, you have to find that the testing alone, even though that testing showed he did not have low platelets, and even though the bruising is actually not, it could have been potential symptoms, but it was not symptoms of ITP. Can I ask that a different way? Is there an argument that effects of a disease could mean higher risk, so that therefore you would have testing in certain instances for people that have a higher risk because they've previously suffered it, and for people that haven't suffered it, you wouldn't have this testing. Is that the kind of way you would understand the testing to be an effect? Because you're not, and I'm not saying I agree with this, but fully recovered in this instance means fully recovered, same as somebody that never had it before, not fully recovered from the symptoms and whatever it was causing, but still at higher risk so that if these symptoms reoccur, you might want to test. I don't think there's any evidence in the record that he would be at a higher risk of having the condition. Then why did all the experts and everybody say that it was standard medical care that given his previous situation, if he shows symptoms, he should be tested? That wouldn't be true if he didn't have this prior condition. So I think that was what Judge Hughes was sort of getting at. I didn't think it was controverted that it was medically desirable or proper or consistent with medical care for him to get this testing because of his prior condition. Right, but I don't think we have anything in the record that states that this child had a higher likelihood of a recurrence of the condition. Why would you answer that? I would assume you would have just said the higher risk is still not within the statutory definition. That what you have to have is an actual effect of the disease or condition, not just a risk that it might have been at. I think you agreed that because of the risk and they did the testing and it turned out these symptoms, the bruising was attributable to this, it would have been compensable. Correct, and our position is that it's set forth in the Chief Special Master's initial decision and incorporating the decision in CRABI and it also has the medical definition of residual effects in the Parsley case. Those are other... Okay, can I just, I want to clarify one thing because I'm a little worried about what you're asking us to do and if it's too broad in some sense. I want to make sure that this is not what you're saying and that it's not just that you keep having to have actual symptoms and something that disease causes, whether it's bruising here or not. What if it's a disease that you can control entirely with medication, but if you go off medication they will come back? You don't require somebody to go off the medication and have the symptoms to be compensable, do you? If they get a disease caused by a vaccine that can be controlled by medication but they have to continue taking that medication for two years, does that take it beyond the six-month period? I believe that's addressed, although just at the special master level at FALP. In the FALP case that's referred here, that's a very different situation than what we have. Well, I understand, but that's why I ask a hypothetical. It seems like that would be a continuing effect, which is you're required to take medication to control symptoms, and if you didn't they would reappear. That's not the same thing as requiring test to disprove or prove that you have it. You would make a distinction there. Yes. I think if there were expert testimony that said were it not for the medication, there was a high likelihood that the symptoms would recur. Also, unlike in this case where there are some statements that the condition had resolved, that's a very different situation. Let me just ask you one final thing. The drawing of the blood in this circumstance was not routine care. It was required or initiated solely because he had had this previous thing with ITP. So he had to undergo an invasive medical procedure, which was the direct result of the vaccine injury. Why is that not sufficient? I think it's a limited circumstance, but assuming suffering means nothing more than experiencing, why isn't that experiencing the residual effects of his initial bout with the ITP? I think our position is really that the residual effects aren't just diagnostic testing, and in terms of suffering, when you say an invasive procedure, that's actually unclear too. The only notation that there was an actual venipuncture, where there was multiple tubes taken, was in the initial hospitalization. There's one that shows it was just a finger prick. We don't know from the other tests whether it was done with a finger prick or a full venipuncture. So in terms of an invasive procedure, I don't know. Let's assume it was, hypothetically, if there was something we could all agree on what the definition of an invasive procedure is. We were talking about that. Would that be sufficient to satisfy suffering medical residual effects? I don't believe so. I think in order to do that, you're finding that the testing alone is a residual effect of the injury, and I think the medical definition, which should be used because this is a statute based on complicated medical injuries, and the residual effects, when one looks at the medical definition, requires more than just mere testing. You need to have some... I get your answer. Can I just ask you one more thing, and this is more of a policy question, so I feel a little uncomfortable asking, but it feels very wrong to me that if you were willing, let's say hypothetically, to say if this kid, they had taken the test and he had shown to be ITP, it would have been quite clear, given all the medical records, that this was the residual effect and he would be compensated. But let's assume we have some families that can't afford the first test or would forego the testing for this, even though the kid had symptoms of bruising, because they can't pay for it. So that's the situation we're arguably in, where even though this would be a medical procedure, an invasive medical procedure, necessary, a result of his earlier bout with ITP, and necessary to determine whether or not he's got ITP, which would be likely, if not clearly, compensable by the government, that's foregone because the government doesn't cover that little piece of it. I do think, with all due respect, that the hypothetical about the families not affording it is that hospitals can't turn you back. Every state in the U.S. has some sort of Medicaid for children. However... Can I ask you this? I'm a little confused about this, and I could have followed it up in reading the record and the section I didn't. They're not just asking to cover the cost of the testing, are they? They're asking for the lump sum payment you get under the table for having this disease. They're not asking for any out-of-pocket expenses. This child was on Medicaid, so the government paid for all of this child's care. The family didn't. The money here, the lion's share of it, was pain and suffering, plus $4,000 and change for... For a Medicaid lien. For what? For a Medicaid lien. For Medicaid. So Medicaid, the government paid for all of this child's care. So the only damages they were seeking is an award for pain and suffering. Can you tell me anything about the practical consequences of finding this case to fall under the statute? How common is it that people who receive vaccines have an injury that, in terms of symptoms, resolves in less than six months, but that lead their medical professionals in the future to say, oh, I see on your chart you had this problem after the vaccine. I'm going to do something or other test-wise that I wouldn't otherwise have done. Is this a small class, a large class? How do we know? In terms of children with injuries like this, it's small because we barely see any cases involving children these days. However, it could be very applicable and affect our cases for those that make up the vast majority of our docket. The vast majority of our docket is now made up of adults claiming orthopedic shoulder injuries as a result of vaccine. There are thousands of those cases. So if you were to find that because of someone's history, if they report to the doctor a year, year and a half later, you know, my shoulder really, really hurts, and the doctor orders an X-ray or MRI that shows nothing, under the reasoning of the Court of Federal Claims, that case meets the severity requirement even if their injury had resolved months and months before just by saying my shoulder is hurting and ordering diagnostic tests regardless of what those tests show. But I guess I was trying to build into the hypothetical that those tests would not be ordered from the same complaint about symptoms in the absence of the history. Correct. And I think someone could say I had a history of a vaccine injury in my shoulder. Like it may have completely resolved, but they say the pain is the same. I really think I still have the problem. And if the doctor orders an X-ray or an MRI, under the reasoning of the Court of Federal Claims in this case, that case meets the severity requirement. And I do not think that is what Congress intended. Congress intended to only compensate those cases that involved serious injuries. That's noted in this Court's decision in Clure. Again, it's not intended to compensate cases like this where the injury resolves in a matter of months. Maybe in this case because the table defined ITP solely as a platelet count of under 50,000, this child may have resolved within a day or two of his presentation at the hospital. The Act is intended to compensate people who suffer serious ongoing injuries. Thank you. Let's hear from the other side, and we'll restore order to a rebuttal. May it please the Court, my name is Michael Milmo. I represent the petitioner, B.W., in this case, and his mother. I'd like to just start out by making a few general observations that I think are worth recognizing about the areas where the experts agreed in this case. That's kind of unusual for vaccine cases. I've been doing this for 35 years, and I can tell you that that's a very rare phenomenon within the vaccine program. The first is that had B.W. not suffered a vaccine injury, his ITP, his blood draws due to his later bruising and petechiae, would never have been performed. And I think that's a very key point that the experts agree upon. Second is that the doctors who did these tests acted within the standard of care. For a child who had ITP and then presents later with bruising and petechiae, they were actively doing the right thing to manage that. Now, I think it's important to... The question is, does diagnostic testing alone, rather than diagnostic testing that reveals that the condition has not resolved, compensable? What evidence is there that Congress intended that? I think the evidence is in the language that they use in defining the severity requirement. That language is quite clear that the petitioner must have, quote, suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. I think the government's position kind of glosses over the issue of... What's clear about residual effects, including diagnostic testing, rather than just actual symptomology of the disease. Well, I think two things. One is that the language here makes clear that you don't have to have the actual illness, condition, disability, or injury for more than six months. Right, effects or complications. It's a lower standard than that because it's the residual... We're not talking about complications. You're not saying testing is a complication of the disease. We're talking about residual effects. Correct. That's what the Court of Federal Claims found. Isn't reading it in context with complications suggesting that it's something that's caused by the disease in terms of symptoms, this is the effect you get when you have this condition, not you have to go get tested for this for two years to make sure it doesn't recur? Well, I think it's important to remember that the experts... I think my basic point is I don't see this as plain, and so I wanted to understand how we resolve it after that. Okay. Well, I think it's important to recognize that in this case here, there's no question. The experts agree that this child's ITP was caused by the vaccine. I mean, he meets a table definition. The government's challenging the severity requirement, but as for the table portion of the case, this is one of those rare cases where the government has actually acknowledged through their expert that this child suffered a vaccine injury because of the MMR shot that he got. And so I think, you know, to me the statute is... the statutory language tells us that the fact that he did not have ITP on those later four tests that were done after the six-month requirement, that's not dispositive, just as Judge Bruging found. And the reason that's not dispositive is because if he had had the bruising that caused those tests to be done and he had the platelet counts that were low, then he would have had proof of the illness, disability, injury, or condition for more than six months. But that's not what Congress intended. Congress intended it would be the residual effects or complications of such illness. Can I direct you to the legislative history of the 1987 amendment? You're familiar with this, I'm sure. Yes. It talks about, you know, because it changed. This is where it changed from one year to six months, I think, if I've got it correct, because they were concerned about one year being too long, apparently, and compensating people for things that had, you know, or whatever reason. But at least the legislative history I have suggests that the subsection eliminates the X provision. Let me go for that. It says it limits compensation program cases in which a person dies from the result of a vaccine or which a person incurs unreversible medical expenses of more than $1,000 and suffers ongoing disabilities for at least six months. And then it repeats in the next part of that disabilities. Now, effects is somewhat ambiguous. I think disabilities is not at all ambiguous. And diagnostic testing does not seem to me to fall within a definition of disability. Do you think testing is a disability? I don't think testing is a disability, but I think ITP is a disability. But he didn't have ITP. So you're having to hang your hat on the effect is the diagnostic testing alone, because I think the government has conceded that if the testing proved that he had it still after six months, then it would have been compensable because he would have the disability. So if we read that legislative history as defining what is a somewhat ambiguous term effect, why doesn't that require a reversal here? Well, I think, Your Honor, it's very important to recognize that that $1,000 requirement and that language was later stricken by Congress. That no longer applies. But it's not just talking about $1,000. It's talking about sufferers' ongoing disabilities. And it wasn't just striking the $1,000. It was changing the year to the six months. Yes, but the reason that it struck the $1,000 is it was trying to be more inclusive. It wanted more people to be compensated, more children. But it was supposed to also be less exclusive by limiting the timeframe from 12 months to six months. And neither of these are going to what they talk about, which is disabilities. Yes, but, I mean, again, a residual effect is not the same as disability. Congress used the term disability in the Act itself in the severity requirements that suffered the residual effects or complications of such illness, disability. I would only get to your point if we think effect plainly includes diagnostic testing. And if it's ambiguous, then at least, I mean, we're not bound by the legislative history by any means. Some people don't even believe in looking at legislative history. I am not one of those. And if I look at the legislative history and looking at what they were trying to do in this whole program, it's compensating for disabilities resulting from vaccines, not a requirement for testing, which is what your argument is. Well, my argument is kind of twofold. Let me make sure. Your argument is not that he had this disease more than six months after the vaccine, is it? That is correct. Okay. Your argument is that diagnostic testing performed more than six months is an effect within the meaning of the statute. Yes, that is. And if effect includes testing, then you win. If effect doesn't include testing, you lose. I think that's right. And Judge Bruegging found that it did. And part of what is— Is that based on the plain language of what effect means? Yes. It is part of the plain language of what the effect means, and it's also on the medical dictionary definition that the respondent uses. The medical dictionary says that it has to be something that results from the illness, disability, injury, or condition. It has to result from. That's the medical definition. That's the tougher definition that Judge Bruegging found we also met. But, I mean, we meet that because the doctors acted because he suffered a vaccine injury. He had ITP. Let's just say that the government is correct. He only had it for three months. He had both parts of the ITP. He had the bruising, and he had the platelet counts. But after the six months, he continued to have the bruising. Now, what would you have these doctors do that— I mean, there is no dispute that the doctors did the right thing in ordering these tests and that the reason they did it was because he initially had this disease. The question is, did Congress intend for you to get this lump sum compensation award for diagnostic testing to confirm that he didn't have the disease, or did they only intend it if he continued to have the disease after six months? They intended for it to include diagnostic testing if that testing was related to the injury that the vaccine caused, as it did here. I really worry about the broad ramifications that rule could have for all kinds of vaccines, including vaccines that are currently in the news and all kinds of effects that people are going to argue about that. I really see very little in the legislative history that suggests Congress intended that when it was talking about effects. Well, I mean, I can't talk about— The only thing I see is when they talk about effects in any more detail in the legislative history is they're talking about disabilities and not diagnostic testing. I mean, I can't get into the coronavirus vaccine— I'm not asking you to, but you understand how broad the rule you're asking for is. It is not a narrow, fact-specific thing. Almost any kind of condition that somebody has will often put them at higher risk for reoccurrence of that. And if just testing to make sure it hasn't reoccurred can bring you back into the table, then I think that vastly expands what Congress intended here, which is to compensate for disabilities resulting from vaccines, not this kind of testing. But if that testing is done near in time, as it was here, within a year or two years of the fact that he suffered a table injury, and the experts agree on the fact that ITP is something that can reoccur. There can be chronic forms of ITP. I will note that one of the doctors who did these tests, one of those four tests in that two-year period after the six months, not only did the tests— She didn't even wait for the tests to come back. She ordered the petitioner to go back three hours away to the hematology clinic at Children's Hospital of Atlanta. That's page 66 of our record. I mean, when these doctors are doing these tests because and only because the child suffered a vaccine injury, then, yes, that qualifies as a residual effect, much like Judge Brugink said it did. I'll just make one other point in response to your question, which is, you know, what does the congressional intent mean? The congressional intent, as Judge Brugink eloquently explained in his decision, is that the vaccine program is supposed to compensate children who, you know, generously, it's supposed to compensate them quickly. It's supposed to compensate children just like BW, children who've had an injury and an injury that the government acknowledges is based on the vaccine. And so you read this language in a more liberal fashion because it's a remedial statute. It's a compensation program. It's not typical litigation. It's a remedial statute, and I think it entitles the petitioner to a more, you know, liberal interpretation of the statute. Again, the fact that he didn't have four tests that showed platelets is kind of immaterial. It was the fact that the vaccine injury caused the need for those, that testing. That testing wouldn't have been done had, you know, he not had a vaccine injury that was, you know, conceded by the government, and that doctor would not have ordered him back to hematology for a hematology consult two years after he had, that six months had elapsed. Had that doctor had not real concern about he might have recurrent ITP. And if you have recurrent ITP, it can potentially be fatal. I mean, these doctors did the right thing because you can't send the child out to the parking lot and not do the testing, you know, when he has unexplained, you know, bruising. I mean, the record is full of things that he came in with bruising that was explained, right? He had a dog bite on his face. He fell off a grocery cart. He got his finger stuck in the car door. They didn't do the testing then. They only did the testing when it was unexplained and he had petechiae and bruising on his body. That's why that doctor said, get down to Atlanta tomorrow, drive the three hours and get your child checked out. That's two and a half years after the onset of his ITP. Mr. Mullen, can I ask you, do you know in other areas of law, tort law or medical malpractice or whatever, does this phrase residual effects come up? And does it, and obviously, if so, is there something to be learned from how that phrase is used? To be honest, I've not looked at other statutory schemes or other places in the law where that term comes up. To me, it is an issue of plain meaning. What it can't mean is that it is the disease itself that has to be present six months after the shot is given. Right, but there's actually a middle ground, right, in the following sense. There can be a residual physical effect, bodily symptom that might no longer be characterized as the initial injury, but is still a physical, bodily effect. That could still exclude mere, I don't mean to discount it, but mere diagnostic testing to see if there is any follow-on physical effect. Well, if it's related to the original event, you've had, I have a friend who's had cancer, bad prostate cancer. He had his prostate removed, but they require him every three months to go to Johns Hopkins and get PET scans to see if it's recurring. And they require him to do that for five full years. You know, he's had eight of those procedures. They showed nothing. But under the government's reading of the statutory language, that's not at all related to his prostate cancer. It's not related to his illness, injury, disability. The government's view is not that it's not related. It's not what the program intended to compensate you with a lump sum pain and suffering award for undergoing a disability. Your view would mean, I think, that any time you suffer a condition that requires testing that's going to go on for years, then they're going to get that lump sum compensation award despite that six-month limitation. Because, of course, testing will occur after that six-month period. I can't see how that, under that scenario, how that would not qualify as a residual effect. It seems to provide a big loophole in Congress's decision to change it from one year back to six months when they were looking at conditions that resolve themselves quickly. Well, this is the language Congress gave us. I noted in the respondent's reply on the last page, it talked about in 1995, the secretary wanted to give some guidance in a proposed rulemaking that he was going to make on ITP. But that's neither here nor there because that can't trump, nor can the legislative history, with all due respect, Your Honor, can't trump the language that Congress actually gave us. This is the language Congress gave us. We're stuck with that. That was passed by both houses of Congress and signed by the president. The secretary or anybody else can't change that at this point. Okay. I think we've exceeded the time, and we have your argument. Thank you. Thank you. We'll restore two minutes if you need it. Let me be very brief. I just wanted to address a point made that this is exceptionally rare that experts would agree. It's not exceptionally rare for the government to challenge the six-month sequela issues in cases where they would otherwise meet the table. So I just wanted to make that point there. The change that Congress made from 86 to 88, was there a change from one year to six months? I had thought that the change was that originally in 86, suffering for more than six months was one way you could have a compensable injury, another was dying, and the third was $1,000 in expenses. And in 87, the committee report, which I think is the one that you cite, said, no, that's too much. And so in 88, the statute was changed to say six months and $1,000 in expenses. Was there some six-month to one-year change? I just want to understand what that language goes through. I'm afraid I'm not familiar with that there. I do want to state, though, to the extent you find the language ambiguous, this is a statute where the government has allowed private parties to sue them so that to the extent it is ambiguous, it must be construed narrowly in favor of the government. I think it's fairly clear from the argument that it is ambiguous and the language is not clear on its face. Therefore, it's important to look at the legislative history, which does show, as Judge Huth was showing, that there was the expectation that there would be ongoing disability, not simply testing, not simply possible symptoms of a disorder. Well, except this language, right? I mean, one thing that is a piece of language that maybe helps the other side is that the residual effect is an effect of injury, et cetera, disability. It doesn't itself have to be a disability. But it's still, I assume, based on the associated terms, whatever that Latin phrase is, it suggests that the residual effect, like complications, like injury, et cetera, is all about physical effects. But it doesn't have to actually be the very same disability, does it? It would need to be a residual. It would need to be an effect. So I think impartially it had the medical definition, which wasn't just results from, but saying residual effects is something left behind. Why would a doctor say, you have to do this test, I wouldn't make you do it if you didn't have this past history, if there was a lingering higher risk, namely, and that lingering higher risk must be, in some sense, physical? I'm sorry, your question is again, why would they have the testing? We have a case here, and this is the situation we're talking about. The doctor says, you come in with a certain symptom, bruising here. I wouldn't do this test were it not for the fact that you once had this earlier injury. The reason I wouldn't do it otherwise and will now do it is that there's something about your body that now is different from what it would have been without the injury, namely a condition of the body presenting a higher risk of ITP. And that's why I'm going to do that. Why is that different higher risk body condition not a residual effect? I don't think a risk of recurrence of a condition is what Congress intended when it said you need to suffer ongoing residual symptoms effect. And again, in the legislative history, it shows ongoing disability. I do not believe that incorporates the risk or a greater risk of having that condition in the future. Okay. Thank you. We thank both sides. The case is submitted. That concludes our proceedings for this morning.